## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Geminatio, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Philip Hustad and VioNano Innovations, Inc.<br><br>Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No.: _1:25-cv-361_ (AMN/TWD) |

Geminatio, Inc. ("Geminatio" or "Plaintiff") for its Complaint respectfully alleges:

## STATEMENT OF THE CASE

1.      Geminatio is a manufacturer of advanced chemical solutions. The company sells and licenses patented, custom chemistry utilized to improve semiconductor performance by creating smaller design features on silicon wafers, enabling more transistors per square millimeter. The more transistors per square millimeter, the better the semiconductor will work. This process is called pitch-splitting.[1]

2.      Geminatio hired Philip Hustad as its Chief Technology Officer ("CTO") on January 17, 2022. *See* Dr. Hustad's signed offer letter with Geminatio, annexed hereto as Exhibit A (the "Hustad Offer Letter"). Dr. Hustad's responsibilities included technology development and commercialization. *See id.* As part of his role with Geminatio, Dr. Hustad was granted access to Geminatio's proprietary information.

---

[1] Pitch-splitting or pitch-doubling refers to a process whereby a single line of circuitry on a semiconductor is split into multiple smaller lines of circuitry, increasing the efficacy of the semiconductor.

3.     To protect its proprietary information, Geminatio required Dr. Hustad to sign a Proprietary Information and Inventions Agreement ("PIIA"). *See* PIIA, annexed hereto as Exhibit B.

4.     In an effort to increase its competitive edge, Geminatio, led by Dr. Hustad, began developing a plan to make use of polymer brush chemistry based on intellectual property contained in a lapsed patent application. Dr. Hustad worked on the now-lapsed patent application while with his former employer, so he was familiar with the technology.

5.     The technology is potentially highly valuable because it presents a new, cost-effective way to accomplish improvement of semiconductor performance with low-cost tools that accomplish the same feat as tools costing hundreds of millions of dollars.

6.     Geminatio instructed Dr. Hustad to coordinate with potential customers to actualize opportunities for Geminatio to bring the technology to market and to prepare slide decks for investors and potential partners, detailing the opportunity presented by the polymer brush technology.

7.     Dr. Hustad participated in some efforts as instructed, *e.g.*, he prepared materials outlining the technology, clearly demonstrating Geminatio's plan to make use of it. However, Dr. Hustad also obstructed other efforts, shrugging off directions to follow-up with customers and refusing to coordinate having the polymer brush technology reduced to practice for Geminatio's efforts.

8.     Unbeknownst to Geminatio, Dr. Hustad was conspiring to steal Geminatio's trade secrets to compete with Geminatio by separately developing, patenting, and marketing the polymer brush technology that Geminatio demonstrably planned to develop and bring to market, with Dr. Hustad's assistance—a clear violation of the PIIA.

9.      Dr. Hustad resigned from Geminatio in September 2024.[2] Thereafter, he started VioNano Innovations, Inc. ("VioNano"). VioNano is a direct competitor to Geminatio and, based on marketing materials shown to Geminatio by one of VioNano's principals, George Barclay, VioNano intends to make use of the chemistry and technology Dr. Hustad conceived of and/or began developing while at Geminatio. Indeed, the marketing materials shown to Mr. Maire by Mr. Barclay included images that were obviously lifted form materials Dr. Hustad prepared while at Geminatio.

10.     Prior to bringing this suit, Geminatio gave Dr. Hustad an opportunity to cease and desist marketing, publicizing, and otherwise disclosing Geminatio's trade secrets and, per paragraph 2 of the PIIA, demanded that he assign to Geminatio any and all (unlawfully) filed patent application(s) relating to Geminatio's trade secrets and proprietary information that Dr. Hustad misappropriated.  Dr. Hustad refused both, falsely claiming that he and VioNano were only developing technology unrelated to his work at Geminatio and that he has not filed any patent applications that relate to or contain Geminatio's trade secrets. Defendants' assertions are contradicted by Mr. Barclay's presentation and statements to Mr. Maire.

11.     Geminatio will be irreparably harmed if Dr. Hustad and VioNano are not enjoined from continuing to misappropriate Geminatio's trade secrets in a competitive enterprise, including disclosing Geminatio's trade secrets and proprietary information, and unlawfully pursuing patents (potentially publishing Geminatio's trade secrets in the process).

---

[2] Dr. Hustad continued to provide services to Geminatio until January 2025, including assisting Geminatio to file several patent applications.

## THE PARTIES

12.     Plaintiff Geminatio, Inc. was incorporated in the state of Delaware in January 2021, and its principal place of business is its lab located in Schenectady, NY, which is manned by three full-time employees and a varying number of temporary employees.

13.     Defendant Philip Hustad is a natural person, residing in the state of Minnesota.

14.     Defendant VioNano Innovations, Inc. was incorporated in the state of Delaware on November 19, 2024. Its principal place of business is located at 11 Taft Mill Road, South Grafton, MA 01560.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

16.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this district pursuant to the New York forum-selection clause contained in the Hustad Offer Letter. *See* Ex. A.

## FACTS

**A.  Geminatio and Its Mission**.

18.     Geminatio sells and licenses patented, custom chemistry utilized to improve semiconductor performance by creating smaller design features on silicon wafers, enabling more transistors per square millimeter. The greater the number of transistors per square millimeter, the better the semiconductor will work.

19.     Robert Maire is Geminatio's Chief Executive Officer and oversees the Company's daily functions.

20.     Geminatio utilizes an acid diffusion technique on chemically amplified resists (CAR) to create images on silicon wafers that are first processed through photolithography.[3] Geminatio takes a CAR with dimensions only a few dozen nanometers in length and width and covers it with a trencher. Heat is then applied to the trencher, causing acid to diffuse on to the CAR. The trencher is then removed, and the CAR is coated with a masker which helps the CAR take on the desired features while interacting with the acid. Once the features have been created, the masker is removed, and the resulting image on the wafer can then be transferred to other materials as desired.

21.     Geminatio also develops distinct and novel chemistry to gain a competitive advantage. While using CAR is the industry standard, Geminatio sought to remain on the cutting edge by developing a pitch-splitting process applicable to metal oxide resists (MOR), which Geminatio recognized could become more prevalent in the marketplace. Geminatio's acid diffusion technique does not work with MOR.

**B. Dr. Hustad Joins Geminatio as CTO.**

22.     Geminatio hired Dr. Hustad as its CTO on January 17, 2022. Dr. Hustad was hired, in part, because of his experience with directed-self-assembly (DSA).[4] As Geminatio's CTO, Dr. Hustad oversaw product road-mapping, development, design, research, interfacing with customers, and he also directed the chemists in Geminatio's lab in Schenectady.

---

[3] Photolithography is a microfabrication process used to create intricate patterns on a substrate, primarily in semiconductor manufacturing, by using light to selectively expose a photosensitive material (photoresist) through a mask, followed by chemical treatments.

[4] Directed-self-assembly includes methods of mass-producing micro to nano devices and materials. Directed assembly allows the accurate control of assembly of micro and nano particles to form even the most intricate and highly functional devices or materials.

23.    As a material condition of Dr. Hustad accepting employment at Geminatio, Geminatio required Dr. Hustad to execute its Proprietary Information and Inventions Agreement, which stated, *inter alia*:

    a.    Company shall have worldwide ownership of all right, title and interest relating to any and all intellectual property and inventions (whether or not patentable), including patent rights, copyrights, trade secret rights, mask works, sui generis database rights, works of authorship, designs, know-how, ideas and information made, conceived or reduced to practice, in whole or in part, by me [Dr. Hustad] during the term of my employment with Company only to the fullest extent allowed by Minnesota Stat. § 181.78…(collectively "Inventions"). I hereby make all assignments of Inventions necessary to accomplish the foregoing. I shall further reasonably assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce, and defend any rights in Inventions specified to be so owned or assigned. Further, with regard to Inventions, I hereby irrevocably designate and appoint Company as my agent and attorney-in-fact, coupled with an interest and with full power of substitution, to act for and in my behalf to execute and file any document and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by me…(Ex. B ¶ 2);

    b.    I [Dr. Hustad] agree that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I develop, learn or obtain during the term of my employment that relate to Company or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information for the term of my employment plus 5 years from termination of my employment. However, I shall not be obligated under this paragraph with respect to information I can document is or becomes readily publicly available without restriction through no fault of mine. Upon termination of my employment, I will promptly return to Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (i) my employment and compensation records, (ii) materials distributed to shareholders generally and (iii) this Agreement. I also recognize and agree that I have no expectation of privacy with respect to Company's telecommunications, networking or information processing systems (including, without limitation, stored computer files, email messages and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice… (*id.* ¶ 4);

c. I [Dr. Hustad,] agree that during the term of my employment with Company (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company (*id.* ¶ 6);

d. I [Dr. Hustad] agree that my obligations under paragraphs 2, 3, 4 and 5 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part. . . (*id.* ¶ 8); and

e. I [Dr. Hustad] also understand that any breach of this Agreement may cause irreparable harm to Company for which damages would not be an adequate remedy, and, therefore, Company may be entitled to injunctive relief with respect thereto in addition to any other remedies and without any requirement to post bond. *Id.* ¶ 9.

24.    The PIIA signed by Dr. Hustad was substantially similar to PIIAs Geminatio required all its employees and agents to sign, including its founders.[5]

25.    As part of his role with Geminatio, Dr. Hustad was granted access to Geminatio's proprietary information, including discussion about how Geminatio would add to its chemical processes to adapt them to MOR, and thereby increase Geminatio's offerings and capabilities.

26.    Dr. Hustad's familiarity with DSA led him to suggest to Geminatio a brand-new application of DSA that would enable Geminatio to create smaller features on MOR using polymer brushes.

27.    The basics of the chemistry underlying Dr. Hustad's suggestion were first published in a patent application filed by Dr. Hustad, alongside Peter Trefonas, III, Jieqian Zhang, and James C. Taylor, in November 2014. Specifically, the patent application sought protections for new methods for forming relief images useful for producing electronic devices, including through the

---

[5]  As part of its efforts to protect its proprietary information and trade secrets, Geminatio also regularly required customers, investors, and entities it entered, or considered entering, partnerships with to sign Non-Disclosure Agreements.

use of polymer brushes, which are microscopic chemical chains with different reactive properties on either end of the chain.

28.     The patent application was assigned to Rohm And Hass Electronic Materials, LLC and Dow Global Technologies, LLC in October 2015, and filed with the United States Patent and Trademark Office ("USPTO") on November 6, 2015. USPTO published the patent application on May 12, 2016 (publication no. 20160133477) (the "Lapsed Patent Application,") a true copy of which is annexed hereto as Exhibit F. USPTO deemed the patent application abandoned as of July 2, 2020, due to the applicant's failure to respond to an outstanding office action letter.

29.     Geminatio's founders realized that the abandonment of the patent application represented an opportunity for Geminatio to further develop the technology and chemistry for use in its business. As early as September of 2023, Mr. Maire instructed Dr. Hustad to develop applications for the polymer brush technology in Geminatio's business.

30.     Using a process conceived by Dr. Hustad while performing his employment duties for Geminatio, polymer brushes would be attached to a MOR, then a masker would be placed over the MOR to help develop the desired features. Once the features had set, the brushes and the MOR would be removed, leaving behind an outline of the desired feature which could then be reproduced on other materials.

31.     In late 2023, a potential Geminatio customer, Western Digital Technologies, Inc. ("Western Digital"), inquired whether Geminatio would be able to assist it in creating distinct features on materials, specifically taking microscopic square holes on those materials and modifying them to smaller circular holes. Dr. Hustad suggested to Geminatio that this was an opportunity to utilize the polymer brush chemistry.

32.     Thereafter, conversation ensued between Western Digital and Geminatio, with Dr. Hustad providing an update to Geminatio that he was having great conversations with Western Digital, and that the next step was to get Western Digital to sign a Non-Disclosure Agreement before he could share more information about Geminatio's processes, which would Geminatio's proprietary information and trade secrets.

33.     Dr. Hustad prepared slides reflecting Geminatio's planned solutions for Western Digital, and these slides were discussed at a Geminatio weekly strategy meeting on March 6, 2024. *See* Western Digital Project Slides, annexed hereto as Exhibit. C.

34.     In April 2024, Dr. Hustad prepared a deck presentation for a potential Geminatio joint development partner, which included images of the Lapsed Patent Application, as well as images depicting how Geminatio would make use of that technology to provide custom solutions for clients. The slide deck provided a roadmap of how Geminatio intended to develop and apply novel and proprietary improvements to polymer brush technology, which was a key part of the Company's planned development. *See* Geminatio Confidential Presentation For Cornell, annexed hereto as Exhibit D. The presentation was labelled at the bottom of each slide: "Geminatio Confidential – Do not share without permission." *Id.*

35.     In several strategy meetings throughout 2024, Mr. Maire specifically asked Dr. Hustad to follow up Western with Digital to pursue the business opportunity which would allow Geminatio to employ the polymer brush technology. Dr. Hustad inexplicably ceased communicating with Western Digital regarding this technology, and did not take any strides to further develop and reduce to practice the polymer brush technology and chemistry as directed by Mr. Maire.

**C. Dr. Hustad Secretly Prepares To Misappropriate Trade Secrets to Compete Against Geminatio.**

36.     Upon information and belief, at SEMICON, a popular industry conference and trade show that took place from July 9 to July 11, 2024, Dr. Hustad discussed a new venture he was considering pursuing separate from Geminatio based on the polymer brush technology with at least one venture capitalist, notwithstanding that Geminatio paid Dr. Hustad's fees and costs to be there. Apparently, without informing Geminatio, Dr. Hustad was planning a competitive venture that would make use of the exact technology and chemistry that Dr. Hustad had suggested to Geminatio and Geminatio had been imploring Dr. Hustad to develop and market as part of his duties as CTO.

37.     On September 29, 2024, Dr. Hustad informed Mr. Maire he would be resigning from Geminatio to pursue his own venture. Dr. Hustad stated that his new venture was related to producing bio-safe chemicals for use in semiconductor manufacturing, a statement now known to be false. Dr. Hustad sent Mr. Maire his resignation letter by email later that day. *See* Hustad Resignation Email and Attachments (Resignation Letter and Proposed Contractor Agreement), annexed hereto to as Exhibit E.

38.     Dr. Hustad offered to remain on staff pursuant to a three-month consulting agreement he proposed, which conspicuously included a carve-out allowing Dr. Hustad to retain ownership of any technology developed during the consulting period that was not specifically related to acid diffusion techniques in use at Geminatio at the time. *See id.* p. 5, ¶ 7. In part because Geminatio was actively developing other lithographic and photolithographic techniques, led by Dr. Hustad, Geminatio rejected Dr. Hustad's proposed form of contractor agreement but agreed that Dr. Hustad could continue to provide services to Geminatio going forward, applying the same historical employment terms.

39.     Geminatio also agreed to pay Dr. Hustad a supplemental fee of $2,000 per patent application for his assistance on Geminatio's behalf and did pay Dr. Hustad $10,000 in such fees.

40.     On October 2, 2024, Dr. Hustad was scheduled to fly to Boston, MA to give a presentation to a client on Geminatio's behalf. Dr. Hustad flew to Boston on that date but instead used the opportunity to meet with his business partner in his forthcoming competitive venture and may have also met with investors for that venture, leaving his direct report, Max Klemes, to give the customer presentation in his place.

41.     Mr. Maire subsequently confronted Dr. Hustad about missing the customer presentation, and Dr. Hustad offered to repay the flight costs which were initially charged to Geminatio.

**D.  Geminatio Discovers Dr. Hustad's Misappropriation Of Its Trade Secrets**

42.     On January 9, Mr. Maire had a videoconference with George Barclay, Dr. Hustad's partner in VioNano, in which Mr. Barclay sought Mr. Maire's support for his and Dr. Hustad's new venture developing the polymer brush technology and bringing it to market.

43.     Mr. Barclay presented a slide show to Mr. Maire. Several of the slides in the deck contained images nearly identical to the confidential materials Dr. Hustad had previously prepared for Geminatio, with some of the images detailing a process for turning square holes into smaller round holes—the exact solution Geminatio intended to accomplish for Western Digital. While claiming that they were not doing anything wrong, Mr. Barclay admitted that Dr. Hustad had already filed patent applications related to several improvements to the technology—a direct violation of the PIIA. *See* Ex. B ¶¶ 2, 4 & 6. Mr. Barclay also noted that Dr. Hustad wanted to conceal this information from Mr. Maire.

44.    Throughout the call, Mr. Maire repeatedly stated to Mr. Barclay that the plan Mr. Barclay was describing significantly overlapped with plans Dr. Hustad had developed and had been tasked with implementing for Geminatio, and that VioNano offering these services and products created a significant conflict with Geminatio. Notwithstanding Mr. Maire's warnings, VioNano, powered by Dr. Hustad's unlawful patent application(s), is currently engaging with customers and sowing confusion in the marketplace about the rightful owners of the improvements to the polymer brush technology and their application. Moreover, by filing patent applications which relate to Geminatio's proprietary information, Dr. Hustad has charted a course to the inevitable disclosure of said information.

45.    On March 7, 2025, Geminatio, through counsel, sent a letter to Dr. Hustad, via counsel, demanding that Dr. Hustad immediately assign ownership to Geminatio of all applications for patents related to intellectual property conceived of or developed while Dr. Hustad was worked at Geminatio, and that Dr. Hustad cease and desist from pursuing any other patent application that threatens to publish Geminatio's trade secrets and undertaking any action to market, publicize, or otherwise disclose any products utilizing any of the intellectual property or inventions developed or conceived while Dr. Hustad was an employee at Geminatio.

46.    In a letter dated March 12, 2025, Dr. Hustad, through counsel, stated that "Dr. Hustad has not applied for patents that meet these criteria (nor have any such patents been issued)." What the letter did not say is that Dr. Hustad had not filed any patent applications at all, nor was there any evidence provided to assuage Geminatio's well-founded concerns. Thus, Geminatio was left with no recourse other than to initiate this action.

47.    Dr. Hustad's misconduct and refusal to reverse course has necessitated this action by Geminatio to avoid the irreparable harm that will befall Geminatio due to Dr. Hustad's actions,

including publication of Geminatio's trade secrets, loss of customers, marketplace confusion, loss of significant economic advantage and opportunity, and violation of Geminatio's bargained for ownerships rights.

### COUNT I
### Breach of Contract (against Dr. Hustad)
(Proprietary Information and Inventions Agreement)

48.    Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

49.    Dr. Hustad entered a valid and binding Proprietary Information and Inventions Agreement, in which he agreed that Geminatio would own all intellectual property and inventions conceived of or developed while Dr. Hustad was employed at Geminatio. Dr. Hustad also agreed that all inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) he developed, learned or obtained during the term of his employment that relate to Company or the business or demonstrably anticipated business of Company or that are received by or for Company in confidence, constitute Proprietary Information, and Dr. Hustad agreed to hold such information in confidence and not disclose or, except within the scope of his employment, use any Proprietary Information for the term of his employment plus 5 years from termination of his employment.

50.    In breach of this agreement, Dr. Hustad has filed patent applications asserting ownership over technology and/or inventions that were conceived and developed while Dr. Hustad was Geminatio's CTO. Prosecution of a patent application generally requires an applicant's careful, nuanced, strategic approach to describing and claiming the application's subject invention. In exchange for an examiner's acceptance of a particular proposed claim, an applicant often is asked to narrow or otherwise modify it to concede or limit the scope of protection afforded by the

claim. Even if patents did eventually issue from Dr. Hustad's applications, Geminatio currently has no input or insight to how Dr. Hustad might be steering or limiting those rights or whether he is pursuing patent protection outside the United States. Moreover, even if Dr. Hustad's patent applications are unsuccessful or abandoned, the underlying trade secrets—the inventions claimed in those applications—are subject to USPTO publication for all the world to review, just as the now expired Dow patent application is accessible.

51.    Upon information and belief, Dr. Hustad has also engaged potential customers and investors on behalf of VioNano to seek investment and market inventions or technology that were conceived of, and that Dr. Hustad worked to develop, while Dr. Hustad was employed by Geminatio, disclosing Geminatio's trade secrets in the process.

52.    As a result of Dr. Hustad's breach of the PIIA, Geminatio has been damaged in an amount to be proven at trial.

## COUNT II
### Breach of Contract (against Dr. Hustad)
(Proprietary Information and Inventions Agreement)

53.    Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

54.    Dr. Hustad entered a valid and binding Proprietary Information and Inventions Agreement, in which he agreed that he would not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Geminatio, and not to assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Geminatio.

55.    In breach of agreement, Dr. Hustad prepared to compete against Geminatio while still employed by the Company by: (i) obstructing Geminatio's efforts to develop and market the

polymer brush technology; (ii) meeting with investors—while on Geminatio's dime—to secure funding for VioNano, a company that directly competes with Geminatio; and (iii) by planning and organizing with George Barclay and others to compete against Geminatio while still providing services to Geminatio.

56.    As a result of Dr. Hustad's breach of the PIIA, Geminatio has been damaged in an amount to be proven at trial.

**COUNT III**
**Breach of Contract (against Dr. Hustad)**
(Proprietary Information and Inventions Agreement)

57.    Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

58.    Dr. Hustad entered the valid and binding PIIA, in which he agreed to assist Geminatio, at the Company's expense, to further evidence, record and perfect assignments of Inventions and Intellectual property related to his work at Geminatio, and to perfect, obtain, maintain, enforce, and defend any rights in Inventions specified owned or assigned by Geminatio.

59.    Dr. Hustad refused to assign patent applications that he filed in breach of the PIIA, or to otherwise assist Geminatio in perfecting, obtaining, maintaining, enforcing, and defending its rights. Dr. Hustad's refusal constitutes an additional breach of the PIIA.

60.    As a result of Dr. Hustad's breach of the PIIA, Geminatio has been damaged in an amount to be proven at trial.

**COUNT IV**
**Misappropriation of Trade Secrets (against Defendants)**
(Minn. Stat. Ann. § 325C.01, *et. seq.*)

61.    Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

15

62.     Under Minnesota law, which governs the PIIA and related claims (*see* Ex. B ¶ 9), it is unlawful for any person to make use of or disclose trade secrets belonging to another when such trade secrets were acquired by improper means, including where, as here, at the time of disclosure or use, the person knew or had reason to know that the trade secrets was acquired "under circumstances giving rise to a duty to maintain its secrecy or limit its use[.]" Minn. Stat. Ann. § 325C.01

63.     Dr. Hustad acquired Geminatio's trade secrets pursuant to and as a consequence of his employment with Geminatio; employment which was conditioned on Dr. Hustad executing the PIIA which prohibited and limited Dr. Hustad's ownership, use, and disclosure of intellectual property and inventions conceived of or developed while he was at Geminatio.

64.     Notwithstanding the obligations arising under the PIIA, Dr. Hustad has filed patent applications asserting ownership over Geminatio's trade secrets and Dr. Hustad and VioNano have engaged potential customers to market technology based on Geminatio's trade secrets.

65.     Dr. Hustad's misappropriation of Geminatio's trade secrets was and continues to be willful and malicious. This is evident from Dr. Hustad's deliberate attempts to obstruct Geminatio's development of its trade secrets, Dr. Hustad preparing to compete against Geminatio while still employed at Geminatio, and by VioNano engaging customers to market products based on Geminatio's trade secrets despite direct knowledge that Dr. Hustad misappropriated proprietary information from Geminatio.

66.     As a result of Dr. Hustad and VioNano's actions, Geminatio has been damaged in an amount to be proven at trial, and Geminatio is also entitled to injunctive relief, exemplary damages, and attorneys' fees.

**COUNT V**
**Violation of Defend Trade Secrets Act (against Defendants)**
(18 U.S.C. § 1836, *et seq.*)

67.     Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

68.     Dr. Hustad acquired Geminatio's trade secrets pursuant to and as a consequence of his employment with Geminatio; employment which was conditioned on Dr. Hustad executing the PIIA which prohibited and limited Dr. Hustad's ownership, use, and disclosure of intellectual property and inventions conceived of or developed while he was at Geminatio.

69.     All such information and know-how constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

70.     Geminatio's trade secrets that Dr. Hustad and VioNano misappropriated derive economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by Geminatio's competitors or other persons who might obtain economic value from their disclosure or use.

71.     At all relevant times, Geminatio has taken reasonable measures to protect the secrecy of the trade secrets that it developed through substantial effort and which Dr. Hustad and VioNano have misappropriated, such as by limiting the individuals who have access to such trade secrets to those who need it to perform their duties for Geminatio, and requiring employees, investors, potential partners, and customers to execute confidentiality agreements, and by otherwise labeling materials containing trade secrets as confidential.

72.     Defendants' actions constitute misappropriation under 18 U.S.C. § 1839(5). For example, and without limitation, Defendants are engaging customers to market products based on

Geminatio's trade secrets and attempting to process patent applications asserting ownership of the same.

73.     Defendants' misappropriation has caused or threatens to cause damage to Geminatio, including, at a minimum, loss of profits, goodwill, and competitive advantage.

74.     Defendants' actions in misappropriating Geminatio's trade secrets were willful, malicious, and done with the intent to injure Geminatio and improve Defendants' economic opportunities, thereby entitling Geminatio to punitive damages under 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under § 1836(b)(3)(D).

75.     Geminatio is also entitled to permanent injunctive relief to prevent irreparable harm to Geminatio, including harm that cannot adequately be compensated by money damages.

### COUNT VI
### Breach of Fiduciary Duty (against Dr. Hustad)
(New York Common Law)

76.     Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

77.     Under New York law,[6] the elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.

78.     As an employee and as an officer of Geminatio, Dr. Hustad owed Geminatio fiduciary duties of loyalty, good faith and care.

---

[6] While the PIIA and related claims are governed by Minnesota law, Dr. Hustad's fiduciary duty owed to Geminatio arises out of his employment relationship with Geminatio as an officer of the Company. That relationship is governed by New York law. *See* Ex. A ¶ 15. *Dépeçage* (from the French, meaning "dismemberment") is a concept within the field of conflict of laws whereby different issues within a single case are governed by the laws of different jurisdictions.

79.    Dr. Hustad breached his fiduciary dutties to Geminatio by misappropriating and disclosing Geminatio's trade secrets and confidential information, and by preparing to compete with Geminatio while still working for Geminatio.

80.    As a result of Dr. Hustad's breach of his fiduciary duties owed to Geminatio, Geminatio has been damaged in an amount to be proven at trial.

**COUNT VII**
**Tortious Interference With Prospective Economic Advantage (against Dr. Hustad)**
(New York Common Law)

81.    Plaintiff incorporates by reference each and every allegation previously made herein as if the same were fully set forth.

82.    Under Minnesota law,[7] the elements of a cause of action for tortious interference with prospective economic advantage are: (1) the existence of a reasonable expectation of economic advantage, (2) defendant's knowledge of that expectation of economic advantage, (3) defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; (4) in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and damages directly caused by the defendant's misconduct; and (5) plaintiff sustained damages.

83.    Plaintiff had a reasonable expectation of economic advantage concerning at least one prospective client. Dr. Hustad himself suggested to Geminatio that Western Digital's request for Plaintiff's assistance creating distinct features on materials, specifically taking microscopic square holes on those materials modifying them to smaller circular holes presented an opportunity

---

[7]    The elements of tortious interference with prospective economic advantage are substantially similar under New York, and the facts allege herein are sufficient to enable Plaintiff to plead the same cause of action in the alternative under New York law.

for Plaintiff to use its know-how. Paid work on that project also would have afforded Plaintiff the additional advantage of further development and evolution of its polymer brush chemistry know-how and applications.

84.    Dr. Hustad knew of the Western Digital opportunity and the economic advantage that it presented; indeed, Plaintiff charged Dr. Hustad with responsibility for conducting those discussions on Plaintiff's behalf. Indeed, the lucrative promise of the Western Digital project and the possibilities that Geminatio's polymer brush know-how presented for other applications apparently catalyzed those breaches, prompting Dr. Hustad to self-deal and usurp Geminatio's opportunities on Geminatio's dime and time rather than push his employer Geminatio's work forward for Western Digital.

85.    Dr. Hustad intentionally interfered with Plaintiff's reasonable expectation of economic advantage by delaying and then discontinuing his discussions on behalf of Plaintiff with Western Digital, by refusing to implement for Geminatio the polymer brush application that was ideal for the Western Digital project, and by diverting his time and attention to plan to compete directly with Geminatio. Dr. Hustad's interference breached his fiduciary duties to Plaintiff, among other wrongful conduct.

86.    In the absence of Dr. Hustad's wrongful conduct, it is reasonably probable that Plaintiff would have realized its economic advantage or the benefit of Western Digital's engagement of Plaintiff for performance of the work that Western Digital proposed.

87.    As a result of Dr. Hustad's wrongful conduct, Geminatio has been damaged in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully prays that the Court enter an order awarding Geminatio temporary, preliminary and permanent injunctive relief and all available damages, including but not limited to:

i.   enjoining Dr. Hustad and VioNano from using or disclosing Geminatio's trade secrets and confidential information;

ii.  enjoining Dr. Hustad and VioNano from filing or pursuing patent applications for claimed inventions using or derived from Geminatio's trade secrets and confidential information;

iii. declaring Dr. Hustad's patent applications and claimed inventions using or derived from Geminatio's trade secrets and confidential information to be owned exclusively by Geminatio, and causing the USPTO to record such ownership for those patent applications;

iv.  causing the USPTO to suspend immediately and until this Court orders otherwise all prosecution and publication of Dr. Hustad's patent applications using or derived from Geminatio's trade secrets and confidential information and to confirm same to Geminatio;

v.   compensatory damages;

vi.  punitive damages pursuant to 18 U.S.C. § 1836(b)(3)(C);

vii. exemplary damages pursuant to Minn. Stat. Ann. § 325C.03;

viii. pre and post judgment interest;

ix.  attorneys' fees and costs; and

x.   such other and further relief as the Court deems just and proper.

Dated: March 21, 2025

HARRIS ST. LAURENT & WECHSLER LLP

By: ____*s/ David B. Wechsler*_____
     David Wechsler, Esq.*
     Juannell Riley, Esq.*
     40 Wall Street, 53rd Floor
     New York, New York 10005
     (212) 847-7905
     dwechsler@hs-law.com
     jriley@hs-law.com

     _____*s/ Daniel LeCour*s_____
     Daniel LeCours, Esq. (Bar Roll # 700155)
     Harris Beach Murtha Cullina PLLC
     677 Broadway, Suite 1101
     Albany, New York 12207
     (518) 427-9700
     dlecours@harrisbeachmurtha.com

     *Attorneys for Plaintiff Geminatio, Inc.*

     *Pro hac vice application to be submitted